## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**EDWARD BRENNAN, ANNIE CRAWFORD, KATHLEEN MITTELSTEADT, SUZANNE McGEE, and DEANE STOKES, JR., on behalf of themselves and all others similarly situated,**

**Plaintiffs,**

**v.**

**AT&T CORP., a New York Corporation,**

**Defendant.**                                         **No. 04-CV-433-DRH**

### MEMORANDUM AND ORDER

**HERNDON, District Judge:**

### I.  Introduction

Now before the Court are three motions submitted by Defendant AT&T ("Defendant") (Docs. 85, 96, 108) and one motion submitted by Plaintiffs Edward Brennan, Annie Crawford, Kathleen Mittelstadt, Suzanne McGee, and Deane Stokes, Jr. ("Plaintiffs") (Doc. 133).  Defendant makes two motions to dismiss — one for failure to state a claim on which relief can be granted and one based on the doctrine of primary jurisdiction  (Docs. 85, 108) — as well as a motion to compel arbitration (Doc. 96).  Its motions to dismiss relate only to the claims of Plaintiffs Annie Crawford and Deane Stokes, Jr., while its motion to compel relates to the claims of the remaining Plaintiffs (Edward Brennan, Suzanne McGee, and Kathleen

Mittelsteadt).  In their motion, Plaintiffs seek to strike Defendant's reply to Plaintiffs' response to Defendant's motion to compel.  (Doc. 133.)  For the reasons below, the Court grants in part and denies in part Defendant's motion to dismiss for failure to state a claim (Doc. 85), denies Defendant's motion to dismiss under the primary jurisdiction doctrine (Doc. 108), grants in part and denies in part Plaintiff's motion to strike (Doc. 133), and denies at this time Defendant's motion to compel arbitration (Doc. 96).

## II.  <u>Background</u>

On June 22, 2004, Cheryl Hall, on behalf of others similarly situated, brought an action against Defendant alleging unjust enrichment, money had and received, and various statutory violations related to Defendant's allegedly unfair billing practices.  (Doc. 1.)  Plaintiffs amended their complaint slightly more than a month later and added Loretta Sanford, Sandra Wiles, and Annie Crawford as named Plaintiffs.  (Doc. 6.)  On March 1, 2005 the Court granted in part and denied in part Defendant's first motion to dismiss, dismissing Plaintiffs Cheryl Hall and Sandra Wiles.  (Docs. 70, 71.)  Plaintiffs followed by filing a seven-count second-amended complaint, adding named Plaintiffs Edward Brennan, Kathleen Mittelsteadt, Suzanne McGee, and Deane Stokes, Jr., and dropping Lorretta Sanford. (Doc. 74.) Defendant then filed motions to compel and dismiss.  Plaintiffs responded in opposition and filed their own motion to strike one of Defendant's replies.[1]

---

[1] Although Plaintiffs bring their case "on behalf of themselves and others similarly situated," no motion for class certification is currently pending before

Plaintiffs' underlying claim is that Defendant deliberately charged various individuals improper nonusage fees.  In their words, Plaintiffs allege that Defendant "engaged in a deliberate scheme to establish accounts and billing plans with recurring non-usage charges for telephone numbers that the [local exchange carriers] computers say are [presubscribed] to AT&T, without verifying whether those telephone numbers are associated with persons who intend to become AT&T long-distance customers."  (Doc. 136, p. 7.)  Plaintiffs bring their claims under the **Federal Communications Act, 47 U.S.C. § 151 et seq.** ("Communications Act" or the "Act") (Counts (I-III)), the **Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1 et seq.** ("IUDTPA") (Count VI), and the **Illinois Consumer Fraud Act, 815 Ill. Comp. Stat. 505/1 et seq.** ("ICFA") (Count VII), as well as for unjust enrichment (Count IV) and for money had and received (Count V).  Defendant, in response, argues that Crawford's and Stokes's claims should be dismissed both for failure to state a claim and under the primary jurisdiction doctrine, and that arbitration should be compelled as to Brennan's, Stokes's, and Mittelsteadt's claims.

### III.  <u>Analysis</u>

#### A.    **Defendant's Motion to Dismiss for Failure to State a Claim**

Defendant first moves, pursuant to **Federal Rule of Civil Procedure 12(b)(6)**, to dismiss claims asserted by Plaintiffs Crawford and Stokes.  Defendant

---

the Court.  Plaintiffs did file a motion for class certification on August 11, 2004 (Doc. 11); the Court, however, deemed this motion moot on March 1, 2005 (Doc. 71).

argues for dismissal as to Crawford with regard to all seven Counts in the complaint, but only with regard to Count III as to Stokes.   Plaintiffs, in response, acknowledge that Crawford cannot succeed on her **47 U.S.C. § 201** (Count I), unjust-enrichment (Count IV), money-had-and-received (Count V), or ICFA (Count VII) claims  (Doc. 98, pp. 9, 17-18); however, they oppose dismissal of her remaining Counts.

### 1.       12(b)(6) Motion to Dismiss Standard

When ruling on a motion to dismiss for failure to state a claim, a court assumes as true all well-pleaded facts, plus the reasonable inferences there from, and construes these in the light most favorable to plaintiff.  ***Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998) (citing *Wiemerslage v. Maine Township High Sch. Dist. 207*, 29 F.3d 1149, 1151 (7th Cir. 1994))**.  The question is whether, under those assumptions, the plaintiff has a right to legal relief.  ***Fries*, 146 F.3d at 457**.

### 2.       Crawford's and Stokes's section 203 Claims (Count II)

**47 U.S.C. § 203** prevents carriers from charging rates other than those filed in their tariff with the Federal Communications Commission ("FCC").  **47 U.S.C. § 203(a)**.  In pertinent part, it states that

> no carrier shall (1) charge, demand, collect, or receive a greater or less or different compensation for such communication, or for any service in connection therewith, between the points named in any such schedule than the charges specified in the schedule then in effect, or (2) refund or remit by any means or device any portion of the charges so specified, or (3) extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule.

**47 U.S.C. § 203(c)**.  Plaintiffs Crawford and Stokes allege that Defendant violated

**section 203** by assessing "unauthorized charges that clearly are outside its tariff." (Doc. 98, p. 6.)  According to these Plaintiffs, Defendant began improperly assessing these charges in February 2004.   (Doc. 74, pp. 8, 10.)

On August 1, 2001 several FCC orders took effect that significantly altered the responsibilities of long-distance telecommunications carriers.[2]  *See Dreamscape Design, Inc. v. Affinity Network, Inc.*, **414 F.3d 665, 668 (7th Cir. 2005)**.  These orders did away with the tariff system referenced in **section 203(c)** and instituted a new system under which consumers can either accept or reject the terms of a carrier's contract.  ***Id.***  Plaintiffs do not dispute this fact.  (Doc. 98, p. 8.) They do, however, claim that even though the tariff regime is no longer in force, Defendant still violated **section 203**, for three reasons: First, they argue without elaboration that "[n]ot all services provided — and charged for — by AT&T were subject to detariffing on August 1, 2001."  Second, they state that the class period includes dates prior to the detarrifing date, August 1, 2001.  Third, they indicate that "[b]ecause the Consumer Services Agreement references the AT&T tariff, it remains appropriate for Plaintiffs to assert a claim for assessment of unauthorized charges that are outside AT&T's tariff with respect to the time period after detariffing." (Doc. 98, pp. 8-9.)

The Court finds these arguments unavailing.  Taking them in turn, Plaintiffs first fail to identify either the services Defendant provided that were not

---

[2] The FCC, it should be noted, has authority to enforce various telecommunications regulations and statutes.  **See 47 U.S.C. § 160(a)(1)**.

subject to detariffing or the charges allegedly violating **section 203**.  Instead, they make a bald statement that the expired tariff system still applies to some of Defendant's services.  (Doc. 98, p. 9.)  This statement alone is insufficient, in this context, to withstand a motion to dismiss.  Though, as Plaintiffs admit, the tariff regime ended on August 1, 2001 (Doc. 98, p. 8), the improper charges allegedly assessed to Crawford and Stokes did not begin to appear until February 2004.  (Doc. 74, Pls. 2d Am. Compl., ¶¶ 34, 50.)  Plaintiffs do not attempt to reconcile this conflict, nor do they explain how the now-defunct tariff scheme applies to charges assessed after its expiration.  Absent some suggestion of how Defendant managed to violate **section 203** post-detariffing, Plaintiffs cannot adequately support Crawford and Stokes's **section 203** claims.

Second, although Plaintiffs seek to represent a class of individuals, some of whom allegedly received improper bills from Defendant prior to detariffing, no class has yet been certified, nor is a motion for class certification pending. Defendant's motion to dismiss, instead, relates strictly to the claims of Crawford and Stokes — neither of whom began receiving allegedly improper charges until February 2004, well after the August 2001 detariffing date.  Plaintiffs' argument that the "class period" includes dates prior to detariffing, therefore, is of no consequence in the context of this Court's consideration of Defendant's motion to dismiss Crawford's and Stokes's **section 203** claims.  Neither Plaintiff alleges that improper charges were assessed prior to detarrifing.  (Doc. 74, Pls. 2d Am. Compl., ¶¶ 34, 50.)

Third, Plaintiffs provide insufficient support for their argument that because Defendant's Customer Service Agreement ("CSA") defines "services" to include long-distances services that Defendant once provided under the now-defunct tariff regime, the charges assessed to Crawford and Stokes — well after the end of this regime — somehow violate the tariff Defendant was formerly required to file. Plaintiffs, that is, fail to explain why merely because Defendant's CSA references the expired tariff system, Defendant must now provide services pursuant to that system.[3] The tariff system, as noted above, ended more than four years ago. ***Dreamscape Design***, **414 F.3d at 668**.  Whether or not Defendant's contracts mention services formerly provided under that system, it now defunct.  Plaintiffs have offered no reason why Defendant should be bound to it.

Therefore, because Crawford and Stokes have provided no basis for holding Defendant to an expired tariff system, ***id.***, because the relevant charges were assessed more than two years after that system ended, and because Plaintiffs have identified no services that survived detariffing, the Court grants Defendant's motion to dismiss as to Crawford's and Stokes's **section 203** claims (Count II).

### 3. Crawford's 47 U.S.C. § 202/406 Claim (Count III)

As **47 U.S.C. § 202** provides, for the purposes of the Communications Act, "[c]harges or services . . . include charges for, or services in connection with, the use of common carrier lines of communication." **47 U.S.C. § 202**.  **47 U.S.C. § 406**,

---

[3] Plaintiffs, further, have not alleged that either Crawford or Stokes was a party to the CSA.

meanwhile, provides that

> [t]he district courts of the United States shall have jurisdiction upon the relation of any person alleging any violation, by a carrier subject to this Act, of any of the provisions of this Act which prevent the relator from receiving service in interstate or foreign communication . . . from said carrier at the same charges, or upon terms or conditions as favorable as those given by said carrier for like communication or transmission under similar conditions to any other person, to issue a writ or writs of mandamus against said carrier commanding such carrier to furnish facilities for such communication or transmission to the party applying for the writ.

**47 U.S.C. § 406**.  Plaintiffs insist that this latter language, when read in light of **section 202**, entitles Crawford to the injunctive relief she requests — an order "prohibit[ing] AT&T from sending her and other class members inaccurate bills that include unauthorized charges." (Doc. 98, p. 11.)  Defendant argues to the contrary. (Doc. 110, p. 3.)

The Court is unpersuaded by Plaintiffs' argument.  By its plain language, **section 406** only permits a court to order a provider of communications services to affirmatively furnish services to an individual who alleges a violation of the Act.  *See, e.g.*, ***Mical Comm. Inc. v. Sprint Telemedia, Inc.*, 1 F.3d 1031, 1036, 1036 n.2 (10th Cir. 1993)** (noting that **section 406** provides a remedy to those who have been "denied" services).  Crawford neither seeks Defendant's services nor alleges that Defendant denied her services.  Rather, she asks only to be protected from receiving future improper charges from Defendant.  This forecloses relief under **section 406**. Because she does not seek to be furnished with Defendant's services, Crawford's

**section 202/406** claim (Count III) must be dismissed.

### 4.    Crawford's IUDTPA Claim (Count VI)

The IUDTPA offers a means for courts to prevent companies from engaging in deceptive trade practices.  "Although the Act was intended to protect businessmen and provide them with a remedy for unethical competitive conduct, its provisions have also been found applicable to cases where a consumer brings suit." ***Brooks v. Midas-Int'l Corp.***, **47 Ill. App. 3d 266, 275 (Ill. App. Ct. 1977)**.  In pertinent part, the IUDTPA provides that "[a] person likely to be damaged by a deceptive trade practice of another may be granted injunctive relief upon terms that the court considers reasonable. Proof of monetary damage, loss of profits or intent to deceive is not required." **815 ILL. COMP. STAT. 510/3**.

As the language above indicates, "injunctive relief is obtainable by an individual consumer [under the IUDTPA] where that consumer can allege facts that he likely would be damaged by the defendant's conduct in the future." ***Smith v. Prime Cable***, **276 Ill. App. 3d 843 (Ill. App. Ct. 1995)**.  Here, Crawford argues that because she faces a "significant risk" that Defendant will bill her improperly, she is entitled to injunctive relief under the IUDTPA.  (Doc. 98, p. 17.)  Defendant, in contrast, argues that because (1) Crawford no longer receives erroneous charges from Defendant; (2) Crawford was not deceived by the improper charges in the first place; and (3) Crawford now knows how to avoid any improper charges assessed by Defendant, she is not "likely to be damaged" by Defendant's deceptive practices, and

thus her IUDTPA claim must be dismissed.  (Doc. 86, pp. 6-7; Doc. 110, pp. 3-4.)

For the proposition that Crawford's awareness of Defendant's improper billing practices provides her with sufficient knowledge to avoid improper charges, Defendant relies on a line of cases holding that when a plaintiff is aware of deceptive trade practices, she is not likely to be damaged by such practices because she knows how to avoid them.  *See* ***Grazewksi v. Coronet Ins. Co.*, 483 N.E.2d 1263, 1267 (Ill. 1985); *Popp v. Cash Station, Inc.*, 613 N.E.2d 1150 (Ill. App. Ct. 1992)**.  In this case, Crawford does indeed have some knowledge of Defendant's improper billing practices.  There is, however, a meaningful distinction: unlike the parties in the cases Defendant cites, Crawford cannot easily avoid the improper charges by refusing to do business with Defendant.  When the allegedly improper charges appeared on Crawford's bill, that is, she was neither affiliated with Defendant nor Defendant's customer.  Thus, even if she wants to, Crawford cannot entirely sidestep Defendant's charges.

Even so, Defendant argues that Crawford, having discovered improper charges in the past, is not "likely to be damaged" because she knows enough to avoid them in the future.  (Doc. 86, pp. 6-7.)  Simply because Crawford was not previously deceived by Defendant's charges, however, does not imply that she is immune from future damage.  Deception, under the IUDTPA, includes conduct that "creates a likelihood of confusion or misunderstanding." **815 Ill. Comp. Stat. 510/2**.  The act of issuing incorrect, puzzling charges to a noncustomer certainly meets this

standard.  Although it is true that Crawford recognized Defendant's charges in the past, she may not be so fortunate in the future — particularly when a charge may appear as nothing more than one line in a lengthy phone bill from another provider. (*See* Doc. 115, ¶ 5.)

Given these facts, Crawford may be able to demonstrate, as she indicates, both that she faces a "significant risk" of receiving improper bills in the future and that she is likely to be damaged by Defendant's conduct.[4]  As such, the Court declines to grant Defendant's motion to dismiss Crawford's IUDTPA claims.

### B.  Dismissal Under the Primary Jurisdiction Doctrine

Defendant next moves to dismiss Crawford's and Stokes's claims under the primary jurisdiction doctrine.  That doctrine, as it is raised by Defendant, "allows a court to refer an issue to an agency that knows more about the issue, even if the agency hasn't been given exclusive jurisdiction to decide it." **Arsberry v. Illinois, 244 F.3d 558, 563 (7th Cir. 2001);** *see also* **Star Net, Inc. v. Global Naps, Inc., 355 F.3d 634, 639 (7th Cir. 2004)**.  The Court, in other words, is asked to abstain from hearing the matter and refer to agency expertise. **Arsberry, 244 F.3d at 563-64**.  The doctrine is not to be reflexively applied; rather, it "envisages a fact specific

---

[4] At the very least, Crawford — who stopped receiving improper charges only after this case was brought — would have been able to establish as much when she initiated her action.  And as this Court noted in its March 1, 2005 Order, "a defendant cannot forcibly settle with a named plaintiff so as to moot their claims and thereby dispose of the class action."  (Memo. And Order, March 1, 2005, p. 11) (citing **Deposit Guaranty Nat'l Bank v. Roper, 445 U.S. 326, 339 (1980)**).

inquiry peculiar to the facts of each case." *Gross Common Carrier, Inc. v. Baxter Healthcare Corp.*, 51 F.3d 703 (7th Cir. 1995) (citing *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 64 (1956)).  Where the issue in question is a matter of law, however, agency referral under the primary jurisdiction doctrine is generally unnecessary.  *See Baltimore & Ohio Chicago Terminal R.R. Co. v. Wisconsin Cent. Ltd.*, 154 F.3d 404, 411 (7th Cir. 1998); *Gross Common Carrier*, 51 F.3d at 706 n.3.  A number of factors are considered by courts in deciding whether to invoke the doctrine, including the need for consistency and uniformity, the extent to which a matter is beyond a court's expertise, and judicial economy.  *Ryan v. Chemlawn Corp.*, 935 F.2d 129, 131 (7th Cir. 1991).  "There is no fixed formula for the invocation of the doctrine of primary jurisdiction;" rather, "'the decision whether to apply it depends upon a case by case determination.'"  *Id.* (citation omitted).

Here, Defendant asks this Court to invoke primary jurisdiction and refer this matter to the FCC.  Defendant identifies three reasons why this matter should be referred.  First, Defendant argues, the issues raised by Plaintiffs' complaint "already are before the FCC in a rulemaking proceeding," and therefore it would be "wasteful of judicial resources for this Court to make determinations regarding those same information exchange issues that might contravene the FCC's conclusions."[5]

_____

[5] Defendant attempts to clarify this argument in its reply, noting that "[t]he import of the FCC's rulemaking is not that the FCC has completely resolved the issue of the use of [Customer Account Record Exchange] data, but rather that the

(Doc. 109, p. 2.)   Second, the issues Plaintiffs raise are "not within judges' conventional experience," and would be more appropriately heard by the FCC. (Doc. 109, pp. 2-3.)  Third, there is "a significant danger of inconsistent rulings that would disrupt the statutory scheme set forth in the [Communications Act]," and therefore the FCC — because of its experience — should "impose and supervise . . . industry-wide relief."  (Doc. 109, p. 3.)

In response, Plaintiffs argue that Defendant misunderstands their complaint.  Under their theory of the case, Defendant did not issue improper charges because of a "mere error in the exchange of electronic billing information," but rather "engaged in a deliberate scheme to establish accounts and billing plans with recurring non-usage charges for telephone numbers that the [Local Exchange Carriers'] computer systems say are [presubscribed] to AT&T, without verifying whether those telephone numbers are associated with persons who intend to become AT&T long-distance customers." (Doc. 136, p. 7.)  Plaintiffs, in other words, claim that Defendant deliberately employed deceptive, fraudulent billing practices, and in so doing violated the Communications Act, state statutes, and common law.

Taking Defendant's arguments in turn, first, it does not appear as though the instant issues have been or will imminently be ruled on by the FCC.

---

FCC has particular competency and interest in such issues." (Doc. 150, pp. 4-5.) This clarification, however, diverges from Defendant's earlier point that a decision by this Court might directly "contravene the FCC's conclusions" (Doc. 109, p. 2), and instead restates Defendant's second argument (that the FCC has particular experience with the issues presented by this case that this Court lacks).

Defendant's statement that "the same customer information exchange issues raised by Ms. Crawford's and Mr. Stokes' claims presently are before the FCC in a pending rulemaking proceeding," that is, does not appear quite right.  The proceeding to which Defendant refers resulted in the FCC's "Report and Order and Further Notice of Proposed Rulemaking" (Doc. 111, attach. 3-8), adopted on February 10, 2005. Therein, the FCC promulgated a set of rules "help[ing] to ensure that consumers' phone service bills are accurate and that their carrier selection requests are honored and executed without undue delay." (Doc. 111, attach. 3, ¶ 2.)  With regard to the "further notice of proposed rulemaking," the FCC also indicated that it "seek[s] comment on issues relating to the exchange of customer account information between local exchange carriers." (*Id*.)  The FCC did not, however, discuss the allegedly improper conduct Plaintiffs have implicated in their complaint — the deliberate practice of assessing reoccurring nonusage charges to nonconsenting individuals — nor did it indicate that it would.[6]  Moreover, it declined to adopt a uniform system for transmission or exchange of customer account information, such as the industry-developed CARE (Customer Account Record Exchange) system, that might have touched on Defendant's conduct.  (Doc. 111, attach. 5, ¶ 59.)  As such, Plaintiffs' claims need not be referred due to a pending FCC proceeding.  Based on the evidence before the Court, the issues raised by Plaintiffs are not imminently

---

[6] Rather, as the language above indicates, the proposed rulemaking refers only to the exchange of information between the local exchange carriers themselves.  (Doc. 111, attach. 5, ¶ 75.)

before that agency.

Second, this matter is not outside the realm of the Court's experience. Plaintiffs ask this Court to decide whether allegedly fraudulent conduct violated several statutes.  This task is a question of law that is well within the Court's expertise. *See, e.g.*, **Nader v. Allegheny Airlines, Inc.**, **426 U.S. 290, 305 (1976)** ("The standards to be applied in an action for fraudulent misrepresentation are within the conventional competence of the courts.").  Although some courts have found referral appropriate where a plaintiff seeks a "reasonableness" determination, *see* **Gilmore v. Southwestern Bell Mobile Sys.**, **224 F. Supp. 2d 1172, 1177 (N.D. Ill. 2002) (Hart, J.)** (referring a strict "unreasonableness" claim to the FCC under the primary jurisdiction doctrine); *see also* **In re Long Distance Telecomm. Litig.**, **831 F.2d 627, 631 (6th Cir. 1987)**, and although Plaintiffs seek the Court's determination of whether Defendant's practice is "just and reasonable," (Doc. 74, pp. 10-11), the Court here is not faced with a complex question of whether the amounts of Defendant's charges were reasonable, or whether Defendant's rates were reasonable in light of services provided.  Rather, the Court is confronted with a more familiar issue — namely, whether Defendant's conduct was deceptive and fraudulent in violation of several statutes.  This is a question of law that may be decided by the Court, *accord* **Gilmore v. Southwestern Bell Mobile Sys.**, **210 F.R.D. 212, 222 (N.D. Ill. 2001) (Hart, J.)** (holding that the question of whether contract and fraud claims are cognizable under **section 201** "is a legal question that is appropriately

resolved by a court and does not require the expertise of the FCC"), and does not require FCC referral.

Third and finally, Defendants have not sufficiently demonstrated that a decision by the Court would "disrupt the statutory scheme set forth in the [Communications Act]." Though a need for uniformity and consistency clearly exists with regard to regulated conduct across industries, and though in situations where a practice is prevalent in an industry this need cannot adequately be addressed by a court confronted only with one entity's conduct, the Court is not persuaded that the practice Plaintiffs dispute occurs on an industry-wide basis. Defendant has introduced no evidence to suggest that the allegedly improper practices implicated in Plaintiffs' complaint prevail throughout its industry. (*See* Docs. 109, 150.) Absent such a showing, the Court is unable to determine that a ruling it makes might lead to inconsistent holdings and disrupt the statutory scheme established by Congress with the Communications Act.

For these reasons, the Court declines to dismiss the claims of Crawford and Stokes under the primary jurisdiction doctrine. The issues these claims present are within the realm of the Court's experience, and the Court is aware of no extenuating circumstances that require referral.

### C.    Motion to Compel Arbitration/Motion to Strike

#### 1.    Plaintiff's Motion to Strike

Moving to the final pair of motions this Court now takes up, the Court faces an initial decision about whether to recognize Defendant's reply brief (Doc. 130)

to Plaintiffs' response (Doc. 113) to Defendant's motion to compel arbitration (Doc. 96).  This issue arises because Defendant, when filing its reply, introduced several exhibits and two declarations that it relies heavily on in replying to Plaintiffs' response.  (Docs. 131, 132; Doc. 131, Exs. A-O; Doc. 132, Exs. A-D.)  Plaintiffs contest this submission and move to strike Defendant's reply brief in its entirety, in addition to the declarations and exhibits that accompany it.  (Doc. 133.)

Generally, arguments introduced for the first time on reply are considered waived.  This both ensures that parties have the opportunity to respond to their opponents' arguments and prevents courts from being placed into the awkward position of having to either (a) accept a party's argument without full briefing, or (b) do research and construct counter arguments on a party's behalf.  *See Parrillo v. Commercial Union Ins. Co.*, 85 F.3d 1245, 1250 (7th Cir. 1996) (holding that new arguments on reply are waived in the appellate context); *see also* **S.D. ILL. LOCAL RULE 7.1(c)** ("Under no circumstances will sur-reply briefs be accepted.").  The Local Rules of this District disfavor reply briefs, which should only be filed in "exceptional circumstances."  **S.D. ILL. LOCAL RULE 7.1(c)**.

Here, Defendant does not present new arguments in its reply brief, but rather supports earlier arguments with substantial new evidence.  (*See* Docs. 131, 132; Doc. 131, Exs. A-O; Doc. 132, Exs. A-D.)  This evidence consists of two new declarations and a total of nineteen new exhibits.[7]  (*See id.*)  The declarations come

---

[7] In comparison, the evidence Defendant originally submitted with its motion to compel arbitration consisted of one declaration and five exhibits, none

from Defendant's employee Kay Jeffries and Defendant's attorney Max Fischer, while the exhibits consist of business records purporting to demonstrate that Plaintiffs were Defendant's customers.  (*Id.*)  Defendant offers no good reason or exceptional circumstance that prevented it from filing these materials with its original motion. Nonetheless, it relies heavily on this evidence in its reply brief.  (Doc. 130.)

The Court determines that this new evidence must be stricken, but that the reply brief itself may stand.  Defendant's motion to compel arbitration presents an issue — whether an agreement to arbitrate exists — requiring a fact-specific inquiry.  Accordingly, Plaintiffs dedicated a significant portion of their response to the one declaration and five exhibits Defendant's original brief relied on for support. (Doc. 97, Reid Decl.; Doc. 97, Exs. 1-5).  (Doc. 113.)  To now allow Defendant the benefit of introducing considerable additional evidence without offering Plaintiffs a corresponding opportunity to respond would be unfair to Plaintiffs, particularly considering the relative volume and import of the new evidence submitted on reply. (*See* Docs. 131, 132; Doc. 131, Exs. A-O; Doc. 132, Exs. A-D.)

In its reply brief, for example, Defendant relies heavily on the Jeffries declaration, citing to it ten times in five pages.  (Doc. 130.)  Defendant identifies no exceptional circumstance, however, that prevented this declaration — or the business records on which it relies — from appearing with its original motion, or that warrants its submission now.  Instead, it indicates that the materials are not actually

of which were Plaintiff-specific.  (Doc. 97, Reid Decl.; Doc. 97, Exs. 1-5.)

"new" because they cover the same ground as the Reid declaration.  (Doc. 141, p. 2.)
While this evidence may indeed relate to the same subject matter as the Reid
declaration, it is clearly "new" in the sense that Plaintiffs have not had the chance to
respond to it.  Particularly given the importance of this evidence,[8] Defendant cannot
now sandbag Plaintiffs with voluminous materials that could have been, but were not,
included with its original motion.  The meat of Defendant's evidence, in other words,
must not be held back until reply, thereby depriving Plaintiffs of an opportunity to
respond.

Given the Local Rules' position on reply briefs, and given the facts here,
the Court therefore will not consider the new evidence submitted by Defendant on
reply or any argument tied directly to that evidence.[9]  Defendant's reply brief itself,
which does not present new arguments or lines of reasoning, will be preserved absent
references to this new evidence.

---

[8] While the exhibits Defendant submitted with its motion to compel relate
almost exclusively to the mailing of the CSA (Doc. 97, Exs. 1-5), the materials
submitted with Defendant's reply mainly relate to individual Plaintiffs' actual use
of Defendant's services (Doc. 131, Exs. A-O; Doc. 132, Exs. A-D).  Because, as
discussed in the following section, actual usage of Defendant's services after
receipt of the CSA is necessary, in the absence of other factors, to a finding that
Plaintiffs entered into agreements to arbitrate, *see Boomer v. AT&T Corp.*, **309
F.3d 404, 414-17 (7th Cir. 2002)**, and because Plaintiffs have denied actually
using Defendant's services (Docs. 114, 115, 116), these materials are of great
moment to Defendant's argument that Plaintiffs entered into binding arbitration
agreements, and thus that this case should be dismissed.

[9] This is not to say that the Court permanently bars Defendant from using
the stricken materials.  Rather, these materials simply will not be considered by
the Court in the context of the current motion to compel arbitration.

### 2.     Defendant's Motion to Compel Arbitration

Defendant next moves to compel arbitration as to the claims of Plaintiffs Brennan, McGee, and Mittelsteadt on the ground that these Plaintiffs were parties to Defendant's CSA at the time of the alleged injuries, and therefore their claims are subject to arbitration.  (Doc. 97, p. 2.)  Plaintiffs respond that Burns, McGee, and Mittelsteadt were not parties to the agreement, and therefore arbitration is inappropriate.

The **Federal Arbitration Act, 9 U.S.C. §§ 1 et seq.**, was drafted "to reverse the longstanding judicial hostility to arbitration agreements," *Gilmer v. Interstate/Johnson Lane Corp.*, **500 U.S. 20, 24 (1991)**, and embodies a strong federal policy in favor of arbitration.  *Moses H. Cone Mem. Hosp. v. Mercury Constr.*, **460 U.S. 1 (1983)**.  Under its provisions, when parties contractually agree to submit their disputes to arbitration, they are bound by that agreement and must pursue their claims there.  *See Boomer v. AT&T Corp.*, **309 F.3d 404 (7th Cir. 2002)**; *see also Gilmer*, **500 U.S. at 35**.  "[A]mbiguities as to the scope of [an] arbitration clause [must be] resolved in favor of arbitration.  *Mastrobuono v. Shearson Lehman Hutton*, **514 U.S. 52, 62 (1995)** (quoting *Volt Info. Scis., Inc. v Board of Trs. of Leland Stanford Junior Univ.*, **489 U.S. 468, 476 (1989)**).  Absent an agreement to arbitrate, however, arbitration cannot be compelled.  *Matthews v. Rollins Hudig Hall Co.*, **72 F.3d 50, 53 (7th Cir. 1995)**; *Farrand v. Lutheran Bhd.*, **993 F.2d 1253, 1255 (7th Cir. 1993)** (citing *AT&T Techs.*,

*Inc. v. Communications Workers*, 475 U.S. 643 (1986)); *Adamovic v. METME Corp.*, 961 F.2d 652, 654 (7th Cir. 1992).  The issue here is whether Plaintiffs Brennan, McGee, and Mittelsteadt entered into valid arbitration agreements with Defendant, and, if so, whether those agreements encompass Plaintiffs' claims.

Defendant follows the logic of *Boomer* to answer this question.  In *Boomer*, the Seventh Circuit found, under Illinois law, that an individual in Illinois to whom Defendant sent a CSA with an arbitration provision agreed to the arbitration provision by using Defendant's services because the document clearly indicated that acceptance could be accomplished by those means.  *Boomer*, 309 F.3d at 414-17. In other words, the court found that the CSA was an offer that was accepted by the consumer's act of using Defendant's services.[10]  *Id.*  Using the same logic, Defendant argues here that because Plaintiffs were each sent the CSA (offer), and because Plaintiffs thereafter used Defendant's services (acceptance), Plaintiffs are bound by the terms of the CSA's arbitration clause, just as the parties were in *Boomer*.  *Id.* at 416-17; (Doc. 97).

Plaintiffs, however, deny both that they accepted the CSA's terms by using Defendant's long-distance services and that they were customers of Defendant when they received the improper charges.  Their position is twofold: First, they argue

---

[10] The court further found that the consumer's inability to recall receiving the CSA did not prevent it from being enforced, as a presumption exists that when a letter is properly mailed and addressed, it is received by the addressee. *Boomer*, 304 F.3d at 415.

that because they did not use Defendant's services during the relevant period, they never entered into binding arbitration agreements with Defendant. (Doc. 113.) Second, they maintain that even if they did agree to arbitrate claims arising out of the CSA, their particular claims fall outside of the scope of those agreements because the agreements had expired by the time the improper charges were accessed. (Doc. 113, p. 5.) Plaintiffs support these arguments with declarations claiming that they were neither customers of Defendant nor users of Defendant's services during the period in question. (Docs. 115, 116, 117.)

To determine whether a valid arbitration agreement arose between parties, a federal court looks to state law governing contract formation. **9 U.S.C. § 2; *First Options, Inc. v. Kaplan*, 514 U.S. 938 (1995)**. In ***Boomer***, the Seventh Circuit used Illinois law to decide that parties entered into a binding agreement to arbitrate. ***Boomer*, 309 F.3d at 415-16**. Illinois law, however, is inapplicable here, as Plaintiffs Brennan, McGee, and Mittelsteadt were not Illinois residents at the time Defendant allegedly assessed the improper charges. Rather, they were residents of Arizona,[11] Pennsylvania, and Wisconsin, respectively. (Docs. 115, 116, 117.)

---

[11] There is some dispute about whether Arizona or California law should apply to Brennan, who has been a resident of both states. (Doc. 97, Reid Decl., ¶¶ 11-15.) However, since 2001 Defendant has only provided service to Brennan's Arizona residence. (Doc. 97, Reid Decl., ¶¶ 11-15.) Moreover, as Brennan admits, although the CSA was originally sent to Brennan's California residence, the allegedly improper charges were assessed when he lived in Arizona, not California. (Doc. 115.) Therefore, although the issue has not been fully briefed by the parties, the Court, in this instance, uses Arizona law in relation to Brennan. In the end, the issue is of no consequence, for as the Court finds below, there is insufficient evidence in the record to suggest — under either states' law — that

Therefore, this Court must look to the laws of these states to determine, as an initial matter, whether Brennan, McGee, and Mittelsteadt entered into valid agreements to arbitrate with Defendant.[12]

After surveying the laws of those states, the Court finds that those states concur with Illinois with regard to contract formation. *See Tabler v. Industrial Comm'n of Arizona*, 47 P.3d 1156, 1158 (Ariz. 2002); *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 434 n.21 (Pa. 2004); *Piaskoski & Assoc. v. Ricciardi*, 686 N.W.2d 675, 679 (Wis. Ct. App. 2004). The Court further notes that here, like in *Boomer*, Plaintiffs Brennan, McGee, and Mittelsteadt each appear to have been sent a copy of the CSA, and that under the above states' laws, silence may constitute acceptance when there is a duty to speak. *See Swingle v. Myerson*, 509 P.2d 738, 740 (Ariz. Ct. App. 1973); *Chorba v. Davlisa*, 450 A.2d 36, 39 (Pa. Super. Ct. 1982); *Hoffman v. Ralston Purina Co.*, 273 N.W.2d 214, 219 (Wis. 1973); (Doc. 97, Reid Decl.). Unlike in *Boomer*, however, there is insufficient evidence here to suggest that Plaintiffs Brennan, McGee, and Mittelsteadt accepted Defendant's offer by using its services. At this point, that is, the Court cannot discern

---

Brennan accepted Defendant's offer by actually using Defendant's services.

[12] Defendant points out that the CSA contains a choice-of-law clause that selects New York law to resolve disputes under the CSA not governed by federal law. (Doc. 97, p. 11 n.4.) Because the Court's present inquiry concerns the question of whether the parties agreed to the CSA itself, however, that clause is not operative in this context. *See Boomer*, 309 F.3d at 415-16 (using Illinois contract law to determine whether the CSA constituted a binding contract).

that the above Plaintiffs each assented to the terms of the CSA — including its arbitration clause — by using Defendant's services after receiving the agreement in the mail.  While Defendant has submitted a declaration by Ellen Reid suggesting as much (Doc. 97, Reid Decl.), Plaintiffs have submitted contrary affidavits by Brennan, McGee, and Mittelsteadt stating that they were not Defendant's customers and did not use Defendant's services during the time period in question.  (Docs. 114, 115, 116.)  No other evidence is before this Court to suggest that these Plaintiffs used Defendant's services after being sent the CSA.

This distinguishes this case from ***Boomer***, where it was clear that the plaintiff actually used Defendant's services after the CSA was sent.  ***Boomer*, 309 F.3d at 415-16**.  That fact is unclear here.  As such, the Court is unable to determine, at this time, that the parties entered into a binding agreement to arbitrate.  Accordingly, the Court cannot presently compel arbitration.[13]

### IV.  Conclusion

Therefore, for the above reasons the Court **GRANTS in part** and **DENIES in part** Defendant's motion to dismiss for failure to state a claim (Doc. 85), such that Counts I-V and VII of Crawford's action and Count III of Stokes's claim are dismissed while Crawford and Stokes's remaining claims are retained; **DENIES**

---

[13] The Court does not foreclose the possibility that additional discovery will reveal that the above Plaintiffs' claims are indeed subject to arbitration.  Rather, in its Order today the Court simply acknowledges that there is, at present, insufficient evidence to compel arbitration.

Defendant's motion to dismiss on primary-jurisdiction grounds (Doc. 108); **GRANTS in part** and **DENIES in part** Plaintiffs' motion to strike (Doc. 133); and **DENIES at this time** Defendant's motion to compel arbitration as to Plaintiffs Brennan, McGee, and Mittelsteadt (Doc. 96).

> **IT IS SO ORDERED**.

> Signed this 8th day of February, 2006.

> /s/          David   RHerndon
> **United States District Judge**